# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * *   *
ZANIA LEWIS,                            *
                                        *    No. 15-907V
                   Petitioner,          *    Special Master Christian J. Moran
                                        *
v.                                      *    Filed: January 24, 2020
                                        *
SECRETARY OF HEALTH                     *    Attorneys' fees and costs, expert
AND HUMAN SERVICES,                     *    costs
                                        *
                   Respondent.          *
* * * * * * * * * * * * * * * * * * *   *
```

Michael A. Baseluos, Baseluos Law Firm, PLLC, San Antonio, TX, for Petitioner;
Claudia B. Gangi, United States Dep't of Justice, Washington, DC, for Respondent.

**PUBLISHED DECISION AWARDING ATTORNEYS' FEES AND COSTS**[1]

Petitioner Zania Lewis claimed that an influenza vaccine was a substantial factor in causing hearing problems. After the parties developed their positions through expert reports, the parties resolved the case without proceeding to a hearing. Ms. Lewis has filed a final motion for attorneys' fees and costs. Pet'r's Mot., filed Sep. 11, 2019. She is awarded $160,882.10.

\* \* \*

---

[1] Because this decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). This means the decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

Ms. Lewis filed her petition in 2015 with attorney Jessica Hayes representing her originally. Ms. Hayes drafted the petition, alleging that administrations of the influenza ("flu") vaccine in 2012 and 2015 contributed to Ms. Lewis's hearing problems. On behalf of Ms. Lewis, Ms. Hayes filed medical records.

The Secretary reviewed this material and advised that compensation was not appropriate. Resp't's Rep., filed Jan. 4, 2016. The Secretary noted that Ms. Lewis's treating doctors had not linked the vaccinations to any hearing problems and that Ms. Lewis had not filed an expert opinion in support of her claim. Ms. Hayes offered to obtain reports that would cure this gap.

After not filing any expert reports, Ms. Hayes filed a motion to withdraw as attorney of record on June 1, 2016. She stated that she intended not to request reimbursement for her attorney's fees and costs. The motion to withdraw was granted. Order, issued June 29, 2016.

As a pro se litigant, Ms. Lewis remained obligated to obtain a report from an expert. On August 11, 2016, she filed a report from Dr. Charles Elliott Morgan, which was subsequently designated as exhibit 12. This report from Dr. Morgan was relatively thin and did not cover all necessary topics.

After a status conference with Ms. Lewis, who appeared pro se, on September 15, 2016, the undersigned issued a set of instructions for experts. These instructions outlined the necessary components of any expert reports. See Instructions, issued Sept. 21, 2016.

On September 29, 2016, Ms. Lewis engaged a new attorney, Michael Baseluos. Pet'r's Mot., exhibit A (timesheets). On this date, Mr. Baseluos reviewed the original petition, the respondent's report, Dr. Morgan's report, and the order regarding expert reports. Timesheets.[2] On November 7, 2016, Mr. Baseluos became counsel of record.

With Mr. Baseluos as counsel of record, Ms. Lewis submitted reports from three experts: Hamid Djalilian, a specialist in otolaryngology; Omid Akbari, a Ph.D. immunologist, but not a medical doctor; and Larry Charleston IV, a neurologist. Dr. Djalilian wrote three reports (exhibits 15, 16 and 24), Dr. Akbari wrote two reports (exhibits 21 and 26), and Dr. Charleston wrote two reports (exhibits 22 and 25). Some of these reports responded to reports that the Secretary

---

[2] Mr. Baseluos first reviewed medical records on December 16, 2016.

submitted from Douglas Bigelow, an otolaryngologist, and Arnold Levinson, an immunologist. The process for obtaining reports from experts essentially concluded on March 8, 2019.

Because the development of written evidence was complete, the parties were directed to file briefs, marshalling the presented evidence. Order, issued May 3, 2019. The order for briefs stated that the outcome of the briefing could be a ruling finding entitlement to compensation, a decision denying compensation, or an order setting the case for a hearing to receive oral testimony. The parties discussed this briefing order in a status conference on May 30, 2019.

In this status conference, the undersigned also inquired whether the parties had explored informal resolution. The parties represented that they would investigate a potential settlement. These efforts were successful as the parties, on September 9, 2019, submitted a stipulation. A September 10, 2019 decision adopted the parties' stipulation and awarded Ms. Lewis $38,000.00. Decision, 2019 WL 5405256.

The next day, Ms. Lewis filed the pending motion for final attorneys' fees and costs.[3] Petitioner requests attorneys' fees of $61,423.60 and attorneys' costs of $198,452.00. Pursuant to General Order No. 9, Ms. Lewis stated that she personally incurred a cost for Dr. Morgan in the amount of $3,590.00. Pet'r's Mot., exhibit I. The total request is $263,465.60.

On September 23, 2019, respondent filed a response to petitioner's motion. Respondent argues that "[n]either the Vaccine Act nor Vaccine Rule 13 contemplates any role for respondent in the resolution of a request by a petitioner for an award of attorneys' fees and costs." Response at 1. Respondent adds, however that he "is satisfied the statutory requirements for an award of attorneys' fees and costs are met in this case." Id at 2. Additionally, he recommends "that the special master exercise his discretion" when determining a reasonable award for attorneys' fees and costs. Id. at 3. Petitioner did not file a reply thereafter.

The undersigned sought clarifications regarding some aspects of the application. Order, issued Dec. 18, 2019. Although Ms. Lewis was afforded

---

[3] Approximately two months before filing the pending motion for a final award of attorneys' fees and costs, Ms. Lewis filed a motion seeking an award of attorneys' fees and costs on an interim basis. The better practice would be to avoid filing a motion for interim fees when counsel can reasonably anticipate filing for final fees.

approximately six weeks to respond, she filed a status report the next day. The motion is ready for adjudication.

\*   \*   \*

Because petitioner received compensation, she is entitled to an award of reasonable attorneys' fees and costs. 42 U.S.C. § 300aa–15(e). Thus, the question at bar is whether the requested amount is reasonable. In light of the Secretary's lack of objection, the undersigned has reviewed the fee application for its reasonableness. See McIntosh v. Sec'y of Health & Human Servs., 139 Fed. Cl. 238 (2018).

**I.     Attorneys' Fees**

The Vaccine Act permits an award of reasonable attorney's fees and costs. §15(e). The Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. This is a two-step process. Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1348 (Fed. Cir. 2008). First, a court determines an "initial estimate … by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" Id. at 1347-48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)). Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings. Id. at 1348. Here, because the lodestar process yields a reasonable result, no additional adjustments are required. Instead, the analysis focuses on the elements of the lodestar formula, a reasonable hourly rate and a reasonable number of hours.

   A.     <u>Reasonable Hourly Rates</u>

Under the Vaccine Act, special masters, in general, should use the forum (District of Columbia) rate in the lodestar calculation. Avera, 515 F.3d at 1349. There is, however, an exception (the so-called <u>Davis County</u> exception) to this general rule when the bulk of the work is done outside the District of Columbia and the attorneys' rates are substantially lower. Id. 1349 (citing Davis Cty. Solid Waste Mgmt. and Energy Recovery Special Serv. Dist. v. U.S. Envtl. Prot. Agency, 169 F.3d 755, 758 (D.C. Cir. 1999)). In this case, all the attorney's work was done outside of the District of Columbia.

 Ms. Lewis requests different rates for the work Mr. Baseluos performed. These are: $265.00 per hour for work performed in 2016, $275.00 per hour for work performed in 2017, $282.00 per hour for work performed in 2018, and $315.00 per hour for work performed in 2019.

4

Concerning the rates from 2016-2018, these rates are reasonable. See DePena v. Sec'y of Health & Human Servs., No. 13-675V, 2018 WL 4846215, at *2 (Fed. Cl. Spec. Mstr. Sept. 6, 2018) (awarding Mr. Baseluos the rates for 2016-2018 that are requested here).

For work in 2019, the requested hourly rate jumps from $282 in 2018 to $315 in 2019, which is approximately at 12 percent increase. The fees motion justifies this increase by citing a 2015 State Bar of Texas hourly rate sheet, an affidavit from an attorney practicing in San Antonio, Texas, and an affidavit from a Houston, Texas attorney who practices in the Vaccine Program. This evidence supports the requested rate for 2019.

### B. Reasonable Number of Hours

The second factor in the lodestar formula is a reasonable number of hours. Reasonable hours are not excessive, redundant, or otherwise unnecessary. See Saxton v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993). The Secretary also did not directly challenge any of the requested hours as unreasonable.

In general, Mr. Baseluos created invoices with sufficient detail to assess the reasonableness of the activity. Most tasks are reasonable. However, Mr. Baseluos has charged paralegal rates for tasks such as organizing documents, mailing documents, and filing documents. These types of tasks are clerical for which no additional fee should be charged. Missouri v. Jenkins, 491 U.S. 274, 288 n.10 (1989); Bennett v. Dep't of Navy, 699 F.2d 1140, 1145 n.5 (Fed. Cir. 1983); Guy v. Sec'y of Health & Human Servs., 38 Fed. Cl. 403, 407-08 (1997). To account for these billings, an amount of $3,000.00 is deducted from the invoice.

Thus, a reasonable amount of attorneys' fees is $58,423.60.

## II. Costs Incurred

Like attorneys' fees, a request for reimbursement of costs must be reasonable. Perreira v. Sec'y of Health & Human Servs., 27 Fed. Cl. 29, 34 (Fed. Cl. 1992), aff'd, 33 F.3d 1375 (Fed. Cir. 1994). Here, the bulk of the requested costs are expert fees. For non-expert costs, Ms. Lewis has requested $785.30 for items such as copying and mailing.[4] Except for a $91.80 duplication in charging

---

[4] The pending motion does not include a request for commonly included items, such as the cost of obtaining medical records and the cost to file a case. Ms. Hayes, who represented Ms.

for sending documents to Dr. Morgan, the costs are reasonable.  Thus, Ms. Lewis is awarded $693.50 for non-expert costs.

The expert costs derive from invoices from Dr. Morgan, Dr. Djalilian, Dr. Akbari, and Dr. Charleston.  Reasonable expert fees are determined using the lodestar method, in which a reasonable hourly rate is multiplied by a reasonable number of hours.  Caves v. Sec'y of Health & Human Servs., 111 Fed. Cl. 774, 779 (2013).  These are considered in turn.

**Dr. Morgan**.  When Ms. Lewis was representing herself, she paid American Medical Experts a total of $3,590 for work performed by Charles Elliott Morgan, a board-certified otolaryngologist.  Pet'r's Mot., exhibit I (General Order #9 statement); Pet'r's Status Rep., filed Dec. 19, 2019, exhibit B, at 2-3.  His first report, filed on Aug. 11, 2016, filled barely one-half page.

Dr. Morgan's report fell very far short of presenting a persuasive opinion.  The deficiencies in the report prompted the undersigned to issue instructions for another report.  After Mr. Baseluos began to represent Ms. Lewis, he attempted to obtain a more useful report from Dr. Morgan.  As part of the fee application process, Mr. Baseluos presented a report from Dr. Morgan, dated January 23, 2017, which was not filed previously.

This second report was approximately 3.5 pages in length.  It is slightly better than the previous report but would have been of little use to Ms. Lewis.  Dr. Morgan based his theory on thimerosal, but he did not explain how thimerosal could cause hearing problems.  See Pet'r's Status Rep., filed Dec. 19, 2019, exhibit B, at 23-26.  On January 23, 2017, Mr. Baseluos proposed a restructuring of Dr. Morgan's report.  Pet'r's Mot., exhibit A at 4 (timesheets).

On January 24, 2017, Mr. Baseluos communicated with Dr. Morgan and American Medical Experts about Dr. Morgan's inability to continue to work as an expert.  Pet'r's Mot., exhibit A at 4 (timesheets).  On January 27, 2017, Ms. Lewis filed a motion for enlargement of time requesting additional time to obtain an expert report.  Ms. Lewis stated that Dr. Morgan had experienced a family emergency that prevented his continued participation as an expert.  The undersigned granted this motion and issued another set of instructions for expert

---

Lewis originally, may have incurred these costs.  However, Ms. Hayes has twice disclaimed an interest in being reimbursed for those costs.

reports that "provide[d] guidance for filing supporting medical literature and expert billing."  Order, issued Feb. 16, 2017.

In the undersigned's experience, competent experts often reasonably charge $5,000 to review medical records and to present their opinions in an initial report.  This background allows the undersigned to find that Dr. Morgan's charge is reasonable.

The undersigned notes that Ms. Lewis's retention of American Medical Experts weighs heavily in the finding of reasonableness.  As someone who appears unfamiliar with litigation, Ms. Lewis may not have known that experts are expected to prepare invoices that list their proposed hourly rate and the tasks that they performed.  Here, neither Ms. Lewis nor her attorney has submitted anything like an invoice from Dr. Morgan.

Moreover, the work from Dr. Morgan was not good.  The first half-page report presents bottom-line conclusions with barely any reasoning.  It cites no medical records and cites no medical articles.  The second three-page report is improved, although it still is lacking.

If an attorney had retained Dr. Morgan and/or American Medical Experts and the attorney had presented the same information, the undersigned may have declined to compensate Dr. Morgan entirely.  The attorney would have an obligation to present more information to justify the reimbursement.  However, holding Ms. Lewis to the standards of an attorney seems unfair.  And, Dr. Morgan did produce two reports for a relatively reasonable amount of money.

Consequently, Ms. Lewis is awarded $3,590 for work performed by Charles Elliott Morgan.

**Dr. Djalilian**.  Dr. Djalilian has submitted an invoice requesting reimbursement for 156 hours of work at hourly rates ranging from $550 per hour (work performed in 2017) to $578 per hour (work performed in 2019).  His request totals $86,854.20.  Pet'r's Mot., exhibit F.

Dr. Djalilian's curriculum vitae, which was filed as exhibit 15, tab CC, presents the following information about him.  He graduated medical school in 1996.  He is board-certified in otolaryngology and neurotology.  When he submitted his first report, he was a professor of clinical otolaryngology at the University of California Irvine Medical Center.  He has written nearly one hundred articles published in peer-reviewed journals and acted as the principal investigator for research grants.

While Dr. Djalilian has testified 5 to 10 times in medical-legal matters in the previous five years, his work in Ms. Lewis's case was the first time he participated in the Vaccine Program. Exhibit 15 at 1; Pet'r's Mot. at 3.

Ms. Lewis has presented very little to justify hourly rates of $550+ per hour.[5] She states: "The hourly rate is consistent with hourly rates charged by medical experts in the VICP." Pet'r's Mot. at 3. This statement is not quite correct. A more accurate statement comes from Mr. Baseluos's letter to American Medical Experts in which Mr. Baseluos stated: "With respect to [Dr. Morgan's] hourly fees, it has been my experience that most experts receive in the range of $400-$450 per hour." Pet'r's Status Rep., filed Dec. 19, 2019, exhibit B at 13.

While special masters have compensated some experts at a rate of $500 per hour, these most highly-paid experts come with two qualifications.[6] First, the experts have professional accomplishments that suggest leadership in the relevant field. Examples includes teaching at prestigious medical schools, conducting research, writing articles in peer-reviewed journals, reviewing manuscripts before publication in a peer-reviewed journal, being selected to serve on committees of national organizations, and receiving honors or awards that recognize accomplishments. Second, and as importantly, the experts have previous experience in working as an expert in the Vaccine Program. This experience allows the expert to work efficiently. Experience contributes to efficiency in several ways, such as, because the expert knows the topic on which an opinion is required, the expert does not require much direction from the retaining attorney; because the expert understands what medical facts support (or undermine) a claim that a vaccine caused an injury, the expert can review medical records quickly; because the expert has reviewed literature in previous cases, the expert does not have to search for and then extensively study medical articles; and because the expert has written reports and seen how an opposing expert responds, the expert can draft reports that cover all topics, and possibly anticipate counterarguments.

Here, although Dr. Djalilian has good professional experience, his credentials do not rise to the level of the experts who are routinely awarded more

---

[5] For example, Ms. Lewis did not present an affidavit from Dr. Djalilian attesting to the rate of compensation when he acted as an expert in other legal matters. Ms. Lewis also did not cite any cases about reasonable rates for otolaryngologists generally.

[6] The undersigned is not aware of special masters finding $550 per hour to be a reasonable hourly rate.

than $450 per hour. Thus, his qualifications, by themselves, do not automatically establish that Dr. Djalilian should be compensated at the rates he requests.

The more significant issue with Dr. Djalilian's background is his lack of experience as an expert in the Vaccine Program. Although Ms. Lewis describes his work as "extremely [thorough] and efficient," Pet'r's Mot. at 3, his invoice does not demonstrate much efficiency. Instead, his invoice shows that he was learning how to present opinions in the Vaccine Program.

One straightforward example of a task that shows Dr. Djalilian did not work as efficiently as other experts is an entry created shortly after he was retained. Dr. Djalilian spent 1.5 hours reviewing sample reports. Pet'r's Mot., exhibit F at 1 (February 2017). For a new expert, reviewing sample reports can orient the expert and provide a model for the expert's forthcoming report. But, more experienced experts would not need to spend this time. The more experienced experts already possess sample reports from their previous work. Thus, this one entry encapsulates a basic problem with Dr. Djalilian's invoice: he requests to be paid at an hourly rate that is awarded to very experienced (and very efficient) experts, yet, at the same time, he spent hours on the case that a very experienced expert would not have.

Other examples of inefficiency are apparent throughout Dr. Djalilian's invoice. To review Ms. Lewis's medical records, Dr. Djalilian spent approximately 15 hours, which seems on the higher side.[7] Pet'r's Mot., exhibit F at 1 (March 2017). But, Dr. Djalilian then spent an additional 7.8 hours summarizing the medical records. In other words, Dr. Djalilian's process for reviewing, understanding, and writing the facts for Ms. Lewis took roughly the equivalent of three eight-hour workdays. This is not efficient.

Dr. Djalilian's time on medical literature also was not reasonable. In his first report, Dr. Djalilian cited 28 articles. In April 2017, Dr. Djalilian created six entries concerning literature review, which total 15.6 hours. In May 2017, Dr. Djalilian made five more entries for reviewing literature, totaling 13.8 hours.

---

[7] By way of comparison, Mr. Baseluos spent approximately 11 hours reviewing medical records. Dr. Akbari, in February 2018, spent approximately 10 hours reviewing medical records. While Dr. Charleston's invoice is not perfectly clear about how much time he spent reviewing medical records, a reasonable estimate is 5.6 hours.

Thus, the total time for reviewing literature for the first report was 29.4 hours.[8] Each of the 11 entries concerning a review of literature was for at least 2.5 hours.

In creating entries for 2.5 (or more) hours, Dr. Djalilian did not comply with the February 16, 2017 Instructions. To guide the preparation of invoices, the Instructions explained: "The expert should list separate tasks separately. A rule of thumb is that every half hour should have a separate task, differentiated from other tasks." Instructions at 6.

The lack of strict compliance with the instructions is not the problem. The problem is that Dr. Djalilian did not provide much detail to assess the reasonableness of his work. One typical entry reads: "Review of literature on vaccine and hearing loss/report update. 2.7 [hours]." Which of those 28 articles did Dr. Djalilian review in those 2.7 hours?

Dr. Djalilian created more detailed entries when he responded to the first report from the Secretary's expert in October 2017. In this context, examples include:

| Date | Activity | Time |
| --- | --- | --- |
| 10/2/17 | Detailed review of Ex 67-3 (7 pp) Risk Factors for Tinnitus | 0.7 |
| 10/30/17 | Literature review on otalgia associated with migraine and review of Teixido paper (7 pp) | 1.5 |

This much time exceeds—by a far margin—a reasonable amount of time. Dr. Djalilian's credentials as a board-certified otolaryngologist are difficult to reconcile with spending 42 minutes on a 7-page article about tinnitus, or 90 minutes on a 7-page article on otalgia.

In addition to the time Dr. Djalilian spent reviewing articles, he also spent a more-than-usual amount of time conferring with Mr. Baseluos. Some of this conferring was necessary because Ms. Lewis's case presented relatively complicated questions about the meaning of significant factor in determining proximate cause. But, some of this consultation seems to reflect the need for more guidance from the retaining attorney.

---

[8] In his first report, Dr. Djalilian wrote that he spent "approximately nine hours on reviewing literature." Exhibit 15 at 1.

Like the example with the review of sample expert reports, the problem is not that Dr. Djalilian conferred with Mr. Baseluos. (Mr. Baseluos is being compensated for all the time he spent conferring with Dr. Djalilian.) The problem is that Dr. Djalilian spent more time than experts who, because of their familiarity with the Vaccine Program, can be retained and produce a useful report without much, if any, involvement from the retaining attorney.

It may be the case that if Dr. Djalilian were to continue participating in the Vaccine Program, his gain in experience would lead to increased efficiency. But, Dr. Djalilian, in his first case in the Vaccine Program, has not achieved that level of efficiency.

Under these circumstances, the undersigned relies upon his experience in reviewing expert invoices in past cases and his experience in working on this particular case to form a reasonable amount of compensation for Dr. Djalilian. The undersigned finds a reasonable hourly rate for Dr. Djalilian's work is $375.00 per hour. To account for problems and inefficiencies in Dr. Djalilian's invoice, the undersigned deducts 25 percent from the requested number of hours, crediting Dr. Djalilian with 117 hours. Thus, a reasonable amount of compensation for Dr. Djalilian is $43,875.00.

**Dr. Akbari**. Dr. Akbari has submitted an invoice requesting reimbursement for 144.5 hours of work at an hourly rate of $550 per hour. His request totals $79,475.00. Pet'r's Mot., exhibit G.

Dr. Akbari's curriculum vitae, which was filed as exhibit 19, presents the following information about him. When he wrote his reports, he was a tenured professor of allergy and immunology in the department of molecular microbiology and immunology at the Keck School of Medicine, University of Southern California. He researches the role of immune cells in health and disease. He wrote 70 articles published in peer-reviewed journals and acted as a peer-reviewer and editor for scientific journals. While Dr. Akbari earned a Ph.D. in cellular and molecular immunology from the National Institute for Medical Research (London), he has not earned a medical degree.

For Dr. Akbari's proposed hourly rate ($550 per hour), Ms. Lewis cites a decision in which he was awarded $500 per hour for work performed in 2017, Hernandez v. Sec'y of Health & Human Servs., No. 16-1058V, 2018 WL 4391060 (Fed. Cl. Spec. Mstr. Aug. 20, 2018). However, this decision does not establish binding precedent, see Boatmon v. Sec'y of Health & Human Servs., 941 F.3d 1351, 1358-59 (Fed. Cir. 2019); and the undersigned declines to follow it. In

11

Hernandez, the special master awarded a well-known neurologist, Marcel Kinsbourne, a rate of $500 per hour.  The special master awarded Dr. Akbari the same rate as Dr. Kinsbourne "given both physicians' qualifications." Id. at *2.

Whether the special master was aware that Dr. Akbari does not have a license to practice medicine is not clear.  The reference to "both physicians[]" suggests that the special master may have assumed Dr. Akbari was "an authorized practitioner of medicine, as one graduated from a college of medicine or osteopathy and licensed by the appropriate board." Dorland's Illustrated Medical Dict. 1443 (32 ed.) (defining "physician").

The undersigned has previously found that an appropriate rate for people who have earned a Ph.D. in immunology but do not have a medical license is $250 per hour.  Dominguez v. Sec'y of Health & Human Servs., No. 12-378V, 2018 WL 3028975, at *5 (Fed. Cl. Spec. Mstr. May 25, 2018).  Because Dr. Akbari has very strong qualifications, such as receiving in 2007 an Eleanor & Miles Shore Fellowship at Harvard Medical School, Dr. Akbari merits a premium.  A reasonable hourly rate for Dr. Akbari's work is $300 per hour.

With respect to number of hours, many of the problems that affected Dr. Djalilian also affect Dr. Akbari.  Dr. Akbari also did not provide much detail in his entries.  Here is one example:

| Date | Activity | Time |
|---|---|---|
| 1/26/2018 | Email communication and studying the attachments, review material to [sic] including the initial filing re: Zania Lewis | 1.4 |

It is not readily apparent whether 1.4 hours was a reasonable amount of time to study the documents because the "attachments" are not described.

To account for this vagueness, the undersigned deducts 20 percent from Dr. Akbari's hours.  Dr. Akbari will be credited with 115.6 hours.  A reasonable amount of compensation for Dr. Akbari's work is $34,680.00.

**Dr. Charleston**.  Dr. Charleston submitted an invoice listing 54.5 hours of work and requesting compensation at an hourly rate of $575 per hour.  Dr. Charleston's request totals $31,337.50.  Pet'r's Mot., exhibit H.

Dr. Charleston graduated from the Wayne State University School of Medicine in 2005.  After an internship and residency, he completed a fellowship in headache and facial pain at the Jefferson Headache Center in Philadelphia,

Pennsylvania.  From July 2015 through April 2017, he attended the National Clinical Scholars Program at the University of Michigan.  He became board-certified in psychiatry and neurology in 2009, with a subspecialty in headache medicine in 2012.  He has written at least 16 articles published in peer review journals.  He has served on various committees of the American Academy of Neurology and the American Headache Society.  Exhibit 20 (curriculum vitae).

Dr. Charleston's proposed hourly rate is $575.00 per hour.  Other than a review of his credentials, Ms. Lewis presents very little to justify the proposed hourly rate, arguing only that Dr. Charleston's "hourly rate is commensurate with his specialty in neurology and headache medicine."  Pet'r's Mot. at 5.  In the undersigned's experience, a reasonable hourly rate for Dr. Charleston's work in this case is $400.00 per hour.

The next question is what is a reasonable number of hours for Dr. Charleston's work?  Compared to Dr. Djalilian and Dr. Akbari, each of whom created invoices listing more than 140 hours of work, Dr. Charleston has sought reimbursement for a much smaller amount.  Dr. Charleston requests reimbursement for 54.5 hours.

While Dr. Charleston's invoice is detailed with respect to the exact time of day he performed various tasks, he could describe the tasks with more detail.  To account for the lack of specificity, 10 percent is deducted from the number of hours.

Therefore, a reasonable amount of compensation for Dr. Charleston is $19,620.00.

**Summary on Costs**.  Jointly, Ms. Lewis and Mr. Baseluos request $202,042.00 in costs.  For the reasons explained above, a reasonable amount is $102,458.50.

\*   \*   \*

Three topics merit additional comments.  First, because the amount awarded for expert costs is approximately $100,000 less than the amount requested, the deduction might be perceived as relatively large.  However, this perception about the amount awarded depends, in part, on the amount requested.  By starting with a relatively large request, Ms. Lewis and her attorney-expert team may be anchoring an assessment of the value of these services.  See Robert A. Prentice and Jonathan J. Koehler, A Normality Bias in Legal Decision Making, 88 Cornell L. Rev. 583, 604 (2003) ("First impressions are powerful influences on judgment and seem to

13

provide the prism through which subsequent information is filtered.  Even when first impressions are erroneous, they continue to affect judgment long after they have been discredited.").  The inflation contained in the initial proposal is most readily apparent in the hourly rates that the experts have proposed.  The requested rates, as noted above, exceed by at least $100 per hour, the highest rate that Mr. Baseluos accurately said, "most experts receive."  Ms. Lewis has not presented persuasive evidence or argument to justify the proposed increase.

Second, even after the deductions, Ms. Lewis is being awarded more than $100,000 in costs for experts.  In the undersigned's experience, this amount is relatively high for a case that did not go to a hearing.  The amount awarded reflects the complexity of Ms. Lewis's case, in which she retained an otolaryngologist, an Ph.D. immunologist, and a neurologist.  In more straightforward cases, a petitioner might reasonably rely upon an expert from one discipline and the reasonable costs would be less.

Third, the amount spent to litigate this case (attorneys' fees plus costs) exceed—by a factor of four—the amount awarded to Ms. Lewis through the parties' stipulation ($38,000).  While the amount of compensation to Ms. Lewis for her alleged vaccine-caused injury plays no role in the lodestar formula, both parties may wish to consider how they invested resources in this case.

\*      \*      \*

The Vaccine Act permits an award of reasonable attorney's fees and costs. 42 U.S.C. § 300aa-15(e).  A reasonable amount of attorneys' fees and costs is $160,882.10 distributed as follows:

a. **A total of $157,292.10 (representing $58,423.60 in attorneys' fees and $98,868.50 in attorneys' costs) is awarded as a lump sum in the form of a check jointly payable to petitioner and petitioner's counsel, Mr. Michael Baseluos; and**

b. **A total of $3,590.00 is awarded in the form of a check payable to petitioner for Ms. Lewis's costs.**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[9]

**IT IS SO ORDERED**.

s/Christian J. Moran
Christian J. Moran
Special Master

---

[9] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.