# In the United States Court of Federal Claims

### No. 15-907V
### (Filed: July 30, 2020)[1]

```
* * * * * * * * * * * * * * * * * * * * * * *
                                            *
ZANIA LEWIS,                                *
                                            *
            Petitioner,                     *
                                            *
      v.                                    *
                                            *
SECRETARY OF HEALTH AND                     *
      HUMAN SERVICES,                       *
                                            *
            Respondent.                     *
                                            *
* * * * * * * * * * * * * * * * * * * * * * *
```

**National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-1 et seq.; Attorney Fees and Costs; Expert's Hourly Rate; Expert's Number of Hours; Requirement for Contemporaneous Billing Records; Remand.**

Michael Baseluos, Baseluos Law Firm, 2020 East Park Ave, San Antonio, Texas 78212, for Petitioner.

Joseph H. Hunt, C. Salvatore D'Alessio, Catharine E. Reeves, Gabrielle M. Fielding, Claudia B. Gangi, United States Department of Justice, Civil Division, Torts Branch, P.O. Box 146, Benjamin Franklin Station, Washington, D.C. 20044, for Respondent.

---

### OPINION AND ORDER

---

**WILLIAMS**, Senior Judge.

In the underlying action before the Special Master, Petitioner claimed that she developed hearing problems as a result of receiving an influenza ("flu") vaccination and sought compensation under the National Vaccine Injury Compensation Program. Lewis v. Sec'y of Health & Human Servs., No. 15-907V, 2020 WL 831998, at *1 (Fed. Cl. Spec. Mstr. Jan. 24, 2020), reconsideration denied, No. 15-907V, 2020 WL 1283461 (Fed. Cl. Spec. Mstr. Feb. 20, 2020). Following the submission of expert reports, the parties resolved the case without further proceedings. The Special Master adopted the parties' stipulation of settlement and awarded Petitioner $38,000 in damages. Petitioner then sought $263,465.60 in attorney fees and costs. The Special Master issued

---

[1]     Pursuant to Vaccine Rule 18(b) of the Rules of the United States Court of Federal Claims, the Court issued its Opinion under seal to provide the parties an opportunity to submit redactions. The parties did not propose any redactions. Accordingly, the Court publishes this Opinion.

a decision reducing both the hourly rates and number of hours requested for three of Petitioner's medical experts and awarded Petitioner $160,882.10 in attorney fees and costs.

In her motion for review, Petitioner argues that the Special Master abused his discretion in reducing the experts' claimed hourly rates because the rates awarded were not commensurate with the experts' experience and expertise. Petitioner also contends that the Special Master's reduction of the experts' requested number of hours was arbitrary and capricious due to the volume and high quality of the experts' work product. Respondent argues that the reductions were reasonable.

The Court affirms the Special Master's decision with respect to Dr. Akbari's costs and Dr. Charleston's and Dr. Djalilian's hours. The Court remands this matter to the Special Master for re-evaluation of Dr. Charleston's and Dr. Djalilian's rates in accordance with the Court's direction.

## Factual Background[2]

On August 20, 2012, and January 14, 2015, Petitioner received the flu vaccination. Following the administration of these vaccinations, Petitioner suffered from "tinnitus, ringing in the ears, earaches, hearing loss, dizziness, vertigo, loss of equilibrium, and clouding of consciousness." ECF No. 1 at 1-2. On August 20, 2015, Petitioner filed a timely petition under the National Vaccine Injury Compensation Program, ("Vaccine Program") 42 U.S.C. § 300aa–10, et seq., alleging that these medical problems were the result of her 2012 and 2015 flu vaccines. Respondent sought dismissal of Petitioner's claim because her treating doctors had not linked the vaccinations to her injuries and she had not filed any expert opinions supporting her claim. ECF No. 16 at 5-6.

Petitioner's original counsel withdrew on June 29, 2016, and Petitioner continued pro se. On August 11, 2016, Petitioner pro se filed an expert report from Dr. Charles Elliot Morgan, which the Special Master found was "relatively thin and did not cover all necessary topics." ECF No. 36; Lewis, 2020 WL 831998, at *1. The Special Master provided Petitioner with instructions on expert reports in a September 21, 2016 order, and issued supplemental guidance for filing medical literature and expert billing invoices on February 16, 2017.

Petitioner retained new counsel on September 29, 2016, and subsequently filed reports from three experts: Dr. Hamid Djalilian, M.D., a specialist in otolaryngology; Dr. Omid Akbari, Ph.D., an immunologist; and Dr. Larry Charleston IV, M.D., a neurologist. Respondent, in turn, filed expert reports from Dr. Douglas Bigelow, M.D., an otolaryngologist, and Dr. Arnold Levinson, M.D., an immunologist.

Following the submission of expert reports, the parties reached a settlement agreement and the Special Master issued a decision adopting the parties' stipulation and awarded Petitioner $38,000 in compensation.

On September 11, 2019, Petitioner filed a motion seeking $263,465.60, representing $61,423.60 in attorney fees and $198,423 in costs, as well as $3,590 Petitioner personally paid Dr. Morgan. Respondent did not oppose an award of fees and costs, stating that he was satisfied that

---

[2]     This background is derived from the Special Master's decision on attorney fees and costs, and the parties' motions papers.

the statutory requirements for an award of attorney fees and costs were met and requesting that the Special Master "exercise [his] discretion and determine a reasonable award." ECF No. 138 at 2-3.

On February 13, 2020, Petitioner filed a motion for reconsideration of the Special Master's decision as to the costs awarded for Drs. Akbari, Charleston, and Djalilian. Petitioner argued that the hourly rates assigned to Petitioner's experts were "very low relative to their professional expertise, experience in medico [sic] legal matters, and established rates" in both Vaccine Program and non-Vaccine Program cases. ECF No. 144, Ex. 1 at 1. Petitioner stated that "[i]t has become exceedingly difficult for the petitioner's bar to find quality experts," contending:

> Without some predictability [in rates of compensation], experts of the incredibly high caliber of Dr. Akbari, Dr. Charleston, and Dr. Djalilian . . . will not be willing to serve as experts and that is an incredible loss to the [Vaccine Program]. The [Vaccine Program] and Special Masters benefit from new perspectives brought in by extremely well qualified experts . . . Would the program not benefit from fresh perspectives from a new crop of experts rather than having the same experts testify time after time? The science of how vaccines can affect the body requires new talent and fresh perspectives.

Id. at 7.

In her motion for reconsideration, Petitioner cited new exhibits, including updated expert invoices and CVs. Id. at 1-2; Exs. A-J. Petitioner submitted agreements reflecting rates the experts had received in other fora, including a 2017 agreement showing a $750 hourly rate for Dr. Akbari, a 2018 fee agreement showing a $500 hourly rate for Dr. Charleston, a 2015 fee agreement showing a $700 hourly rate for Dr. Djalilian, and a 2019 fee agreement showing an $800 hourly rate for Dr. Djalilian. As a "compromise," Petitioner proposed that the Special Master grant the same amount in expert costs as he originally awarded, but restructure the component amounts to award the experts their requested rates and correspondingly cut their number of hours.

The Special Master denied Petitioner's motion for reconsideration, reasoning that fee applicants bear the burden of proof on a motion for fees and costs, and that "[t]he request for fees must be complete when submitted." Lewis, 2020 WL 1283461, at *2 (citing Duncan v. Sec'y of Health & Human Servs., No. 99–455V, 2008 WL 4743493, at *1 (Fed. Cl. Aug. 4, 2008). The Special Master noted that "[t]he thrust of [Petitioner's] pending motion for reconsideration is a submission of material . . . that she could have presented with her [original] motion," and "[m]otions for reconsideration are not intended to allow second opportunities." Id. at *3 (citing Senza-Gel Corp. v. Seiffhart, 803 F.2d 661, 663-64 (Fed. Cir. 1986)).

On February 20, 2020, the Special Master issued his decision awarding Petitioner $58,423.60 in attorney fees, reflecting a $3,000 reduction for fees claimed for clerical tasks. With

respect to costs, the Special Master reduced the hourly rates and claimed number of hours for Drs. Akbari, Charleston, and Djalilian,[3] and awarded Petitioner $102,458.50 in total.

## Discussion

### Jurisdiction and Standard of Review

Congress created the Vaccine Program as a "Federal 'no-fault' compensation program under which awards can be made to vaccine-injured persons quickly, easily, and with certainty and generosity." H.R. Rep. No. 99-908, at 3 (1986). To that end, Congress assigned the "unenviable job of sorting through these painful cases" to a group of specialists, the Special Masters within the Court of Federal Claims. Hodges v. Sec'y of Dep't of Health & Human Servs., 9 F.3d 958, 961 (Fed. Cir. 1993).

In Vaccine Act cases, the Court of Federal Claims has jurisdiction to undertake a review of the record of the proceedings and may:

(A) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision, (B) set aside any findings of fact or conclusion[s] of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or (C) remand the petition to the special master for further action in accordance with the court's direction.

§ 300aa-12(e)(2)(A)-(C) (2012); Doe 93 v. Sec'y of Health & Human Servs., 98 Fed. Cl. 553, 564-65 (2011).

Under the Vaccine Act, Special Masters may award petitioners reasonable attorney fees and costs. § 300aa-15(e)(1). A Special Master's determination of attorney fees and costs is a discretionary ruling that this Court reviews under the abuse of discretion standard. Hall v. Sec'y of Health & Human Servs., 640 F.3d 1351, 1356 (Fed. Cir. 2011); Caves v. Sec'y of Dep't of Health & Human Servs., 111 Fed. Cl. 774, 778-79 (2013). The Federal Circuit has held

An abuse of discretion occurs when (1) the court's decision is clearly unreasonable, arbitrary or fanciful; (2) the decision is based on an erroneous conclusion of law; (3) the court's findings are clearly erroneous; or (4) the record contains no evidence on which the . . . court rationally could have based its decision.

Heat & Control, Inc. v. Hester Indus., Inc., 785 F.2d 1017, 1022 (Fed. Cir. 1986) (internal citations and quotation marks omitted). While the abuse of discretion standard of review is deferential, it "'is not a rubber stamp.'" Paluck v. Sec'y of Health & Human Servs., 104 Fed. Cl 457, 467 (2012) (quoting Porter v. Sec'y of Health & Human Servs., 663 F.3d 1242, 1256 (Fed. Cir. 2011) ((O'Malley, J., concurring in part and dissenting in part)). "In determining the reasonableness of attorneys' fees and costs, . . . the special master . . . must support a decision with sufficient findings

---

[3]     The Special Master awarded Dr. Morgan's costs in full, reasoning that Dr. Morgan was retained by Petitioner pro se and "did produce two reports for a relatively reasonable amount of money." Lewis, 2019 WL 5405256, at *4.

and adequate legal analysis." Guy v. Sec'y of Health & Human Servs., 38 Fed. Cl. 403, 405 (1997) (citing Wasson v. Sec'y of Dep't of Health & Human Servs., 24 Cl. Ct. 482, 483 (1991)).

It is well settled that "fees for experts are subject to the same reasonableness standards as fees for attorneys." See, e.g., Frantz v. Sec'y of Health & Human Servs., 146 Fed. Cl. 137, 145 (2019). "For attorneys, a reasonable hourly rate is the rate 'prevailing in the community for similar services by lawyers of a reasonably comparable skill, experience, and reputation.'" Id. (quoting Blum v. Stenson, 465 U.S. 886, 896 n.11 (1984)).

It is Petitioner's burden to prove the appropriate hourly rate for an expert. Bell v. Sec'y of Health & Human Servs., 18 Cl. Ct. 751, 760 (1989); Caves, 111 Fed. Cl. at 781. As the Guidelines for Practice Under the National Vaccine Injury Compensation Program explain, "[s]ubmission of curriculum vitae and information regarding the hourly rate paid to the expert in other fora are helpful in determining the hourly rate to be awarded." Guidelines for Practice Under the National Vaccine Injury Compensation Program, at 71 (Office of Special Masters, United States Court of Federal Claims, April 2020). As the Court stated in Frantz:

> In determining the appropriate compensation for experts, a special master may consider the following factors: (1) The witness' area of expertise; (2) the education and training required to provide the expert insight that is sought; (3) the prevailing rates for other comparably respected available experts; (4) the nature, quality and complexity of the information provided; (5) the cost of living in the particular geographic area; and (6) any other factor likely to be of assistance to the Special Master in balancing the interests implicated by the Vaccine Act.

146 Fed. Cl. at 145 (internal quotations and alterations omitted). It is within a Special Master's discretion to determine that "[an] expert's work was not worth the charged hourly rate." Id. at 146. Further, "[s]pecial masters determine the value of an expert's work on an individual case basis." Id.

The Special Master has discretion to reduce a medical expert's hours for vague billing entries, as experts, like attorneys, must detail and explain work performed. Id. at 145. "[H]ours that are excessive, redundant, or otherwise unnecessary" are not compensable. Saxton v. Sec'y of Dep't of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting Hensley v. Eckerhart, 461 U.S. 424, 433-34 (1983); Hines ex. rel. Sevier v. Sec'y of Dep't of Health & Human Servs., 22 Cl. Ct. 750, 754 (1991) ("The special master is within his discretion in reducing hours that are duplicative, padded, spent on unrelated matters, or not 'reasonably expended.'") (quoting Griffin & Dickson v. United States, 21 Cl. Ct. 1, 11 (1990)).

## The Special Master Articulated a Reasonable Basis for Reducing the Hourly Rate and Number of Hours of Dr. Akbari

For Dr. Akbari, an immunologist who wrote two reports, Petitioner requested $79,475 in costs, representing 144.5 hours of work at an hourly rate of $550. The Special Master reduced Dr. Akbari's hourly rate from $550 to $300, reasoning that while Dr. Akbari has a Ph.D. in immunology, he does not have a medical license. The Special Master explained that he had previously found that an appropriate rate for people who have a Ph.D. in immunology, but not a medical license, is $250 per hour, and cited his decision in Dominguez v. Sec'y of Health & Human

Servs., No. 12-378V, 2018 WL 3028975, at *5 (Fed. Cl. Spec. Mstr. May 25, 2018), awarding an expert with a Ph.D. in biochemistry an hourly rate of $250. Lewis, 2020 WL 831998, at *7.

In Dominguez, the Special Master reasoned:

> Based on the undersigned's experience and the cases cited above, there does appear to be support for using $450 per hour as a reference point for a reasonable hourly rate for a medically-trained immunologist with extensive research experience. Given that starting point, the next step is to adjust it to account for [the expert's] lack of medical experience and expertise. Based on the undersigned's knowledge and experience, a physician-scientist appears to warrant an additional $200 per hour compared to [an] equally capable research scientist without a medical degree and experience for at least two reasons. First, a physician can opine on medical questions in addition to purely scientific ones and thus provides additional value to the Program. Second, a physician's time is more valuable outside of the Program since they [sic] can earn compensation not only through their research work, but their clinical work as well. The $200 per hour premium may actually undervalue the real-world value of a medical degree. Thus, the undersigned finds $250 per hour to be a suitable rate of compensation for a comparably respected expert in immunology who does not practice medicine.

2018 WL 3028975, at *5. Here, although the Special Master had previously awarded $250 per hour to an expert holding a Ph.D. in immunology but lacking a medical license, he found that Dr. Akbari "merit[ed] a premium" due to his other "strong qualifications," such as a prestigious 2007 fellowship at Harvard Medical School, and therefore awarded him $300 per hour. Lewis, 2020 WL 831998, at *7.

Petitioner argued that a $550 hourly rate was appropriate because a different Special Master had awarded Dr. Akbari an hourly rate of $500 in Hernandez v. Secretary of Health & Human Services, in 2018. No. 16-1508V, 2018 WL 4391060, at *2 (Fed. Cl. Spec. Mstr. Aug. 20, 2018). In Hernandez, the Special Master reduced Dr. Akbari's claimed hourly rate from $750 to $500, finding it reasonable to apply another expert's--Dr. Kinsbourne's[4]--rate of $500 an hour to Dr. Akbari "given both physicians' qualifications." Id. In the instant case, the Special Master addressed Hernandez, stating that it was unclear "[w]hether the special master [in Hernandez] was aware that Dr. Akbari does not have a license to practice medicine," as the "reference to 'both physicians[]' suggests that the special master may have assumed Dr. Akbari was an authorized practitioner of medicine." Lewis, 2020 WL 831998, at *7. This was a reasonable interpretation of Hernandez, as the Special Master there referred to Dr. Akbari as a "physician." 2018 WL 4391060, at *2.

As Petitioner notes, in two other cases, Shinskey v. Secretary of Health & Human Services and Robinson v. Secretary of Health & Human Services, Special Masters awarded Dr. Akbari his claimed hourly rate of $500. See Shinskey, No. 15-713V, 2019 WL 2064558, at *5 (Fed. Cl. Spec. Mstr. May 9, 2019); Robinson, No. 15-967V, 2018 WL 5629850, at *3 (Fed. Cl. Spec. Mstr. Sept.

---

[4]     Dr. Kinsbourne's specialty is neurology. See Stillwell v. Sec'y of Health & Human Servs., No. 11-77V, 2013 WL 4540013, at *5 (Fed. Cl. Spec. Mstr. June 17, 2013), aff'd, 118 Fed. Cl. 47 (2014), aff'd, 607 F. App'x 997 (Fed. Cir. 2015).

12, 2018).   Relying on these cases, Petitioner argues that it was an abuse of discretion for the Special Master to reduce Dr. Akbari's rate by 40 percent "after three separate special masters have consistently awarded $500/hr."   ECF No. 148, Ex. A at 4.   The Special Master, however, is not obligated to award Dr. Akbari the rate granted by other Special Masters in different cases presenting different factual circumstances and work products.   Boatmon v. Sec'y of Health & Human Servs., 941 F.3d 1351, 1358 (Fed. Cir. 2019).   In any event, Robinson and Shinskey rely upon Hernandez and do not state whether, in awarding Dr. Akbari $500 per hour, the Special Masters were under the impression he was a physician.   Shinskey, 2019 WL 2064558, at *5; Robinson, 2018 WL 5629850, at *3.

Here, based upon the record and the rationale in Dominguez, the Special Master reasonably awarded Dr. Akbari $300 per hour.

**Number of Hours**

The Special Master also reduced Dr. Akbari's number of hours by 20 percent, finding that his time entries were vague, stating:

> With respect to number of hours, many of the problems that affected Dr. Djalilian also affected Dr. Akbari.   Dr. Akbari also did not provide much detail in his entries. Here is one example:

| Date | Activity | Time |
|------|----------|------|
| 1/26/2018 | Email communication and studying the attachments, review material to [sic] including the initial filing re: Zania Lewis | 1.4 |

> It is not readily apparent whether 1.4 hours was a reasonable amount of time to study the documents because the "attachments" are not described.   To account for this vagueness, the undersigned deducts 20 percent from Dr. Akbari's hours.   Dr. Akbari will be credited with 115.6 hours.

Lewis, 2020 WL 831998, at *8.

This Court's review of the record reveals that Dr. Akbari's invoice shows several similarly vague time entries, such as a June 30, 2018 entry claiming 0.6 hours for "email communications and review [o]ther expert reports," a December 28, 2018 entry claiming 2.4 hours for "[s]tudy[ing] the multiple adjuvant effect on immune system," and a February 10, 2019 entry claiming 2.6 hours for "[a]dding a section regarding the role TNF-a."   ECF No. 137, Ex. G at 3, 5.   These entries lack sufficient detail to enable the Special Master to assess the reasonableness of the time claimed. Billing entries must contain sufficient detail to permit a special master to effectively review the claimed fees.   Frantz, 146 Fed. Cl. at 145; McCarty v. United States, 142 Fed. Cl. 616, 628 (2019) (citing Mich. v. U.S. Envtl. Prot. Agency, 254 F.3d 1087, 1093 (D.C. Cir. 2001)).   Here, multiple time entries of Dr. Akbari lacked the detail required to permit meaningful review of the time claimed.   As such, the Special Master reasonably concluded that Dr. Akbari's entries were vague and warranted a 20 percent reduction in hours.

**The Special Master's Rationale for Reducing the Hourly Rate of Dr. Charleston to $400 Requires Amplification**

For Dr. Charleston, a board-certified neurologist who wrote two reports, Petitioner requested $31,337.50 in compensation for 54.5 hours of work at an hourly rate of $575 per hour. Dr. Charleston graduated from Wayne State University School of Medicine in 2005, and completed an internship in internal medicine at St. John Hospital and Medical Center in Detroit, Michigan in 2006. ECF No. 81, Ex. 20, at 1. In 2009, he completed a residency in neurology at Baylor College of Medicine in Houston, Texas, and in 2010 he completed a fellowship in headache and facial pain at Jefferson Headache Center in Philadelphia, Pennsylvania. Id. From 2011 to 2013, Dr. Charleston served as a Director at the Comprehensive Headache Care Center and the Infusion Center for Complex and Chronic Headache in Grand Rapids, Michigan. Id. During this time, he also worked as staff neurologist at Spectrum Health's Butterworth and Blodgett Hospitals. Id. From 2013 to the present, Dr. Charleston has taught neurology at the University of Michigan at Ann Arbor, Michigan. Id. He has also served on various committees for the American Headache Society and the American Academy of Neurology. Id. at 5. Dr. Charleston has worked as a consultant for Charleston Health Neurology & Head Pain Consultants, PLLC, in Pinckney, Michigan, since 2017. Id. at 6.

Observing that "[o]ther than a review of his credentials, [Petitioner] present[ed] very little to justify the proposed hourly rate," the Special Master found that, "[i]n [my] experience, a reasonable hourly rate for Dr. Charleston's work in this case is $400.00 per hour." Lewis, 2020 WL 831998, at *8. In her motion for review, Petitioner argues that Dr. Charleston should receive his claimed hourly rate of $575, citing exhibits attached to her motion for reconsideration, including Dr. Charleston's "updated CV," invoices and fee agreements for work Dr. Charleston performed outside of the Vaccine Program, and the University of Michigan "Medical School Industry Sponsored Speaking Policy," which Petitioner claims "helps to demonstrate the value of time of an UM faculty member" like Dr. Charleston. ECF No. 148, Ex. A at 8-9.

The Special Master did not explain why he determined that a $400 hourly rate for a board-certified neurologist was justified. In 2017, the same Special Master awarded a neurologist a $500 hourly rate and stated that the rates of $425 and $500 the expert had received in other Vaccine cases were "consistent with the rates awarded to neurologists by special masters." Gowans v. Sec'y of Health, No. 14-440V, 2017 WL 1842824, at *5 (Fed. Cl. Apr. 12, 2017). A review of Vaccine Program cases within the last eight years indicates that hourly rates of $450-500 for neurologists are typical. See Brown v. Sec'y of Dep't of Health & Human Servs., No. 09-426V, 2012 WL 952268, at *10 (Fed. Cl. Spec. Mstr. Feb. 29, 2012) (awarding a neurologist hourly rates of $450-500 for work performed in different years); Rosof v. Sec'y of Health & Human Servs., No. 14-766V, 2017 WL 1649802, at *4 (Fed. Cl. Mar. 31, 2017) (awarding a neurologist a $500 hourly rate); cf., Smith v. Sec'y of Health & Human Servs., No. 18-0043V, 2020 WL 1243238, at *9 (Fed. Cl. Spec. Mstr. Feb. 20, 2020) (awarding expert with dual certifications in neurology and immunology $500 per hour).

It may be that the Special Master's reduction in Dr. Charleston's claimed rate to $400 is reasonable and supportable, but the Court cannot tell, as the Special Master did not analyze Dr. Charleston's academic credentials, experience, or work performed in this matter. The Court remands this matter to the Special Master directing that he clarify his rationale for awarding $400 per hour to Dr. Charleston, a board-certified neurologist.

**Number of Hours**

The Special Master reduced Dr. Charleston's claimed 54.5 hours by 10 percent "[t]o account for the lack of specificity" in his billing narratives. Lewis, 2020 WL 831998, at *8. The Special Master stated that, "[w]hile Dr. Charleston's invoice is detailed with respect to the exact time of day he performed various tasks, he could describe the tasks with more detail." Id. Dr. Charleston's time entries include a March 20, 2018 entry claiming 1.3 hours for "Phone call w Attorney Mike," an April 3, 2018 entry claiming 1.4 hours for "Team Conference Call," and a May 13, 2018 entry claiming 1.4 hours for "Report Drafting and Literature Review"--all without any further description of the work performed. ECF No. 137, Ex. H at 1-2. Many of Dr. Charleston's entries lack pertinent details--the topics covered in a phone call, for instance, or a description of literature reviewed--which are necessary for a Special Master to assess the reasonableness of the time claimed. Frantz, 146 Fed. Cl. at 145; McCarty, 142 Fed. Cl. at 628.

Petitioner challenges the Special Master's 10 percent reduction in Dr. Charleston's claimed number of hours, relying on a "more detailed invoice" for Dr. Charleston's work attached to Petitioner's motion for reconsideration, which includes 3.6 hours "he mistakenly overlooked" in his original invoices. ECF No. 137, Ex. H at 8. This invoice was not submitted in conjunction with Petitioner's motion for review--only with her motion for reconsideration--nor does it correct many of the vague entries in the original invoice. For example, entries in Dr. Charleston's "updated invoice" continue to lack pertinent details, such as the April 3, 2018 entry described above, which now claims 1.4 hours for "Expert Team Conference Call: Case discussion from several medical perspectives." ECF No. 144, Ex. F. at 2. Other entries are unchanged, such as the May 13, 2018 entry claiming 1.4 hours for "Report Drafting and Literature Review." Id.

It is well established that that fee applicants are to provide "contemporaneous billing records." See, e.g., Rumsey v. Dep't of Justice, 866 F.3d 1375, 1379 (Fed. Cir. 2017) ("[C]ourts customarily require the applicant to produce contemporaneous billing records or other sufficient documentation so that the district court can fulfill its duty to examine the application for noncompensable hours."); Naporano Iron & Metal Co. v. United States, 825 F.2d 403, 404 (Fed. Cir. 1987) ("The court needs contemporaneous records of exact time spent on the case . . . . In the absence of such an itemized statement, the court is unable to determine whether the hours, fees and expenses, are reasonable for any individual item."); Am. Fed. Bank, FSB v. United States, 74 Fed. Cl. 208, 223 (2006) (denying expenses submitted by a litigation consultant as "a post hoc accounting of . . . work rather than contemporaneous . . . billing records"). The Special Master reasonably refused to consider the revised invoice supporting Dr. Charleston's hours for the first time on reconsideration, as that was not a contemporaneous billing record.

The Court affirms the Special Master's 10 percent reduction of Dr. Charleston's reimbursable hours.

**The Special Master Failed to Articulate a Reasonable Basis for Reducing Dr. Djalilian's Hourly Rate**

For Dr. Djalilian, an otolaryngologist who wrote three reports, Petitioner requested $86,854.20 in compensation for 156 hours of work, at hourly rates ranging from $550 to $578.

In his decision, the Special Master awarded Dr. Djalilian an hourly rate of $375, and reimbursement for 117 hours, a 25 percent reduction in Dr. Djalilian's claimed number of hours. The Special Master found that Petitioner "presented very little to justify hourly rates of $550+ per hour," articulating six examples of credentials that would warrant higher rates and emphasizing the value of prior experience in the Vaccine Program. The Special Master reasoned:

> While special masters have compensated some experts at a rate of $500 per hour, these most highly-paid experts come with two qualifications. First, the experts have professional accomplishments that suggest leadership in the relevant field. Examples include teaching at prestigious medical schools, conducting research, writing articles in peer-reviewed journals, reviewing manuscripts before publication in a peer-reviewed journal, being selected to serve on committees of national organizations, and receiving honors or awards that recognize accomplishments. Second, and as importantly, the experts have previous experience in working as an expert in the Vaccine Program. This experience allows the expert to work efficiently. Experience contributes to efficiency in several ways, such as, because the expert knows the topic on which an opinion is required, the expert does not require much direction from the retaining attorney; because the expert understands what medical facts support (or undermine) a claim that a vaccine caused an injury, the expert can review medical records quickly; because the expert has reviewed literature in previous cases, the expert does not have to search for and then extensively study medical articles; and because the expert has written reports and seen how an opposing expert responds, the expert can draft reports that cover all topics, and possibly anticipate counterarguments.

Lewis, 2020 WL 831998, at *5.

An expert's rate is held to the same reasonableness standards as an attorney's. Frantz, 146 Fed. Cl. at 145. For attorneys, a reasonable hourly rate is the "rate prevailing in the community for similar services by lawyers of a reasonably comparable skill, experience, and reputation." Id., (quoting Blum, 465 U.S. at 896, n.11). Dr. Djalilian is board-certified in otolaryngology and neurotology. Although acknowledging that Dr. Djalilian had "testified 5 to 10 times in medical-legal matters in the previous five years," the Special Master concluded that Dr. Djalilian's credentials "d[id] not rise to the level of the experts who are routinely awarded more than $450 per hour." Lewis, 2020 WL 831998, at *5.

Yet applying the Special Master's six "examples" of professional accomplishments justifying higher rates, it appears that Dr. Djalilian meets them all. First, as to "teaching at prestigious medical schools," Dr. Djalilian was a professor at the University of California, Irvine Medical Center's Department of Otolaryngology. ECF No. 51, Ex. 1 at 1, 2. Second, with respect to conducting research, Dr. Djalilian won the Albert Holmann Research Award in 2000 and the Paparella Clinical Otologic Research Award in 1999. Id. at 6. Third, as to writing articles in peer-reviewed journals, Dr. Djalilian co-authored 92 peer-reviewed papers, and was published in the American Journal of Otolaryngology, the Ear, Nose, and Throat Journal, and the Annals of Otology Rhinology and Laryngology, among other publications. Id. at 7-9. Fourth, with respect to reviewing manuscripts pre-publication, Dr. Djalilian served on the editorial review boards of several journals--Otology and Neurotology, Audiology and Neurotology, Laryngoscope, Hearing Research, and Ear and Hearing. Id. at 4. Fifth, as to selection for committees of national

organizations, Dr. Djalilian served on the Socioeconomic and Audit committees of the American Neurology Society, as well as the Equilibrium, Facial Nerve Disorders, Clinical Scholars, and Implantable Hearing Devices committees of the American Academy of Otolaryngology. Id. at 3. Finally, in addition to his research awards in 1999 and 2000, Dr. Djalilian was awarded an Honor Award in 2006, and was named a Clinical Scholar in 2005, by the American Academy of Otolaryngology-Head and Neck Surgery. Id. at 6.

The Special Master did not say where Dr. Djalilian's qualifications fell short of qualifications that command higher rates. Nor did the Special Master describe the higher paid Vaccine Program experts or articulate what achievements in their background tipped the scales to warrant rates of above $450 per hour. It is well settled that a Special Master must support his opinion with sufficient findings and analysis to enable a reviewing Court to determine whether there was an abuse of discretion. Wasson, 24 Cl. Ct. at 483 (citing Hensley, 461 U.S. at 437).

The Special Master's evaluation of Dr. Djalilian's credentials was as follows:

[A]lthough Dr. Djalilian has good professional experience, his credentials do not rise to the level of experts who are routinely awarded more than $450 per hour. Thus, his qualifications, by themselves, do not automatically establish that Dr. Djalilian should be compensated at the rates he requests.

Lewis, 2020 WL 831998, at *5. The Special Master thus arrived at a rate of $375 per hour for Dr. Djalilian, but failed to explain how he took into account Dr. Djalilian's experience and credentials.

The Special Master did articulate another basis for reducing Dr. Djalilian's hourly rate, reasoning that "[t]he more significant issue with Dr. Djalilian's background is his lack of experience as an expert in the Vaccine Program." Lewis, 2020 WL 831998, at *5. But this notion of reducing rates of experts simply because they lack experience in the Vaccine Program unfairly penalizes new experts and creates an obstacle to broader participation by medical experts in the Program. Procedurally, the "[Vaccine] Program . . . provides for less-adversarial, expeditious, and informal proceedings as well as flexible and informal standards for the admissibility of evidence." Guidelines, Section III, Chapter 1 at 24. Substantively, these vaccine petitions are tort claims where experts are necessary to help the Special Masters understand what can be complex, cutting-edge issues of causation, implicating state-of-the-art medical concepts. As causation in Vaccine petitions is to be assessed on an individual, case-by-case basis, an expert's general lack of familiarity with the Vaccine Program, standing alone, ought not be a ground for reducing an expert's typical hourly rate. Rather, in deciding expert rates, special masters should apply the factors articulated in Frantz. 146 Fed. Cl. at 145.

There is another consideration at play in considering whether it is appropriate to reduce an expert's rate solely due to lack of experience in this forum. Both this Court and Special Masters have highlighted the importance of providing reimbursement of attorney fees and expert costs to encourage the participation of new talent--both legal and medical--in the Vaccine Program. As the Special Master stated in Iannuzzi v. Secretary of Health & Human Services:

Simply put, the ultimate purpose of Vaccine Act fees and costs awards is not to benefit the attorneys involved, but to ensure that Vaccine Act petitioners will have adequate access to competent counsel. Access to such counsel is crucial in enabling

petitioners to prosecute their claims successfully, and in maximizing the amount of petitioners' awards in successful cases. Attorneys will agree to represent petitioners in such cases, however, only if they are ensured an adequate recompense for their time. Accordingly, when attorneys spend a reasonable amount of time and costs in representing Vaccine Act petitioners, such attorneys must be fairly compensated for their expenditures, in order to encourage attorneys to participate in future Vaccine Act cases.

No. 02-780V, 2007 WL 1032379, at *11 (Fed. Cl. Spec. Mstr. Mar. 20, 2007), rev'd in part, 78 Fed. Cl. 1 (2007) (emphasis in original).

More pertinent here, the Court in Frantz recognized the importance of petitioners having access to "quality expert support" and of encouraging "[c]apable experts" to participate in Vaccine Act litigation through adequate compensation. See 146 Fed. Cl. at 146. In Sabella v. Secretary of Health & Human Services, No. 02–1627V, 2008 WL 4426040 (Fed. Cl. Spec. Mstr. Sept. 23, 2008), rev'd in part, 86 Fed. Cl. 201 (2009), the Special Master in this case noted that "[a]ttorneys who are new to the Vaccine Program can improve it by retaining doctors who have not testified in this program as an expert previously. These new experts, in turn, can offer different perspectives that inform the decisions of special masters." 2008 WL 4426040, at *18.[5]

Indeed, Special Masters have awarded an hourly rate of $500 to expert witnesses, despite their lack of experience in the Vaccine Program, when warranted by their credentials and expertise in applicable fields of study. See Schultz v. Sec'y of Health & Human Servs., No. 16-539V, 2018 WL 1835104, at *3 (Fed. Cl. Spec. Mstr. Feb. 16, 2018); Castaneda v. Sec'y of Health & Human Servs., No. 15-1066V, 2018 WL 9457462, at *7 (Fed. Cl. Spec. Mstr. June 21, 2018); Goff v. Sec'y of Health & Human Servs., No. 17-0259V, 2019 WL 3409976, at *5 (Fed. Cl. Spec. Mstr. Mar. 29, 2019). Compensating experts new to the Vaccine Program at hourly rates commensurate with their credentials and expertise consistent with the factors articulated in Frantz would benefit the Vaccine Program, as it would not deter new medical professionals from participating.

Here, the Special Master cited Dr. Djalilian's lack of experience in the Vaccine Program not only as a cause for what the Special Master characterizes as inefficiency, but also as a basis for reducing both his hourly rate and number of reimbursable hours. The Special Master stated that Dr. Djalilian's "invoice shows that he was learning how to present opinions in the Vaccine Program." Lewis, 2020 WL 831998, at *5. As one example, the Special Master cited Dr. Djalilian's time entry claiming 1.5 hours for "reviewing sample reports," stating that "more experienced experts would not need to spend this time" because they "already possess sample reports from their previous work." Id. at *6. According to the Special Master, "this one entry encapsulates a basic problem with Dr. Djalilian's invoice: he requests to be paid at an hourly rate that is awarded to very experienced (and very efficient) experts, yet . . . he spent hours on the case that a very experienced expert would not have." Id.

As "[o]ther examples of inefficiency," the Special Master cited Dr. Djalilian's invoice claiming "roughly the equivalent of three eight-hour workdays" for time spent "reviewing,

---

[5]     "To encourage the participation of new attorneys and new experts," this Special Master stated, time attorneys spend searching for new experts is "generally compensable." Sabella, 2008 WL 4426040, at *18.

understanding, and writing the facts for [Petitioner]," as well as entries claiming 29.4 hours for "reviewing literature" for one of Dr. Djalilian's three reports.  Id.  The Special Master also cited Dr. Djalilian's entries claiming 42 minutes for time spent reviewing a seven-page article on "Risk Factors for Tinnitus," as well as 90 minutes spent on "[l]iterature review on otalgia associated with migraine and review of Teixido paper (7 pp)."  Id.

The Special Master concluded:

It may be the case that if Dr. Djalilian were to continue participating in the Vaccine Program, his gain in experience would lead to increased efficiency.  But, Dr. Djalilian, in his first case in the Vaccine Program, has not achieved that level of efficiency.

Under these circumstances, the undersigned relies upon his experience in reviewing expert invoices in past cases and his experience in working on this particular case to form a reasonable amount of compensation for Dr. Djalilian.  The undersigned finds a reasonable hourly rate for Dr. Djalilian's work is $375.00 per hour.  To account for problems and inefficiencies in Dr. Djalilian's invoice, the undersigned deducts 25 percent from the requested number of hours, crediting Dr. Djalilian with 117 hours.  Thus, a reasonable amount of compensation for Dr. Djalilian is $43,875.00.

Id.

A special master has discretion to reduce the number of hours an expert is awarded due to inefficiencies.  As the Federal Circuit has recognized, it is "well within the special master's discretion to reduce the hours to a number that, in his experience and judgment, was reasonable for the work done," based upon his past experience with attorneys and experts in the Vaccine Program.  Saxton, 3 F.3d at 1521.  It is unreasonable, however, to ding this expert twice for the same inefficiency due to inexperience with the Vaccine Program.  Here, the Special Master reduced Dr. Djalilian's total number of hours by 25 percent, and his hourly rate by 32 percent.  See Lewis, 2020 WL 831998, at *5-7.

It is well established that the reasonableness of an attorney or expert's rate is a separate inquiry from the reasonableness of the number of hours claimed.  See generally Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1347-48 (Fed. Cir. 2008) ("Using the lodestar approach, a court first determines an initial estimate of a reasonable attorneys' fee by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'") (quoting Blum, 465 U.S. at 888)); McCarty, 142 Fed. Cl. at 620-21.  With respect to an expert's rate, the inquiry is whether the rate is that prevailing in the community for similar services by experts of reasonably comparable skill, experience, and reputation.  Frantz, 146 Fed. Cl. at 145 (quoting Blum, 465 U.S. at 896, n.11).  With respect to hours, the inquiry is whether an expert billed too much time for a given task, as excessive, redundant, or unnecessary hours are not compensable.  Saxton, 3 F.3d at 1521.  Thus, inefficiencies should be considered in assessing the reasonableness of hours billed, but they should not additionally impact the rate an expert may command based upon his credentials, experience, and expertise.  As such, the Court upholds the Special Master's reduction of hours due to inefficiencies, but not a reduction in the expert's rate solely due to his lack of

experience in the Vaccine Program.  The matter of Dr. Djalilian's rate is remanded to the Special Master for re-evaluation consistent with this opinion.

### Conclusion

The Special Master's decision as to the costs of Dr. Akbari and the number of reimbursable hours of Dr. Charleston and Dr. Djalilian, is affirmed.

The Special Master's decision as to Dr. Charleston's and Dr. Djalilian's hourly rates is remanded for re-evaluation consistent with this opinion.


s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Senior Judge**