# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**

* * * * * * * * * * * * * * * * * *   \*
ZANIA LEWIS,                          \*
                                      \*   No. 15-907V
         Petitioner,                  \*   Special Master Christian J. Moran
                                      \*
v.                                    \*   Filed: September 11, 2020
                                      \*
SECRETARY OF HEALTH                   \*   Attorneys' fees and costs, expert
AND HUMAN SERVICES,                   \*   costs, remand
                                      \*
         Respondent.                  \*
* * * * * * * * * * * * * * * * * *   \*

Michael A. Baseluos, Baseluos Law Firm, PLLC, San Antonio, TX, for Petitioner;
Claudia B. Gangi, United States Dep't of Justice, Washington, DC, for Respondent.

## PUBLISHED DECISION ON REMAND
## AWARDING ATTORNEYS' FEES AND COSTS[1]

After a January 24, 2020 Fees Decision awarded petitioner Zania Lewis some, but not all, of her requested attorneys' fees and costs, Ms. Lewis filed a motion for review. The Court denied the motion for review in part, upholding some aspects of the January 24, 2020 Fees Decision. However, for two aspects of the January 24, 2020 Fees Decision, the Court granted the motion for review and remanded for additional consideration of the hourly rate for Hamid Djalilian, an

---

[1] Because this decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). This means the decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

otolaryngologist Ms. Lewis retained, and the hourly rate for Larry Charleston IV, a neurologist, whom Ms. Lewis retained.  Opinion and Order, issued July 15, 2020.

After additional consideration, the undersigned finds an increase in the hourly rate for Dr. Djalilian is warranted.  However, no change in the hourly rate for Dr. Charleston is made.

## I. Procedural History

The following events are relevant to resolving the issues on remand.

### A. Entitlement Phase

After Ms. Lewis's case had been pending for slightly longer than one year, Ms. Lewis's current counsel of record, Michael Baseluos, became her attorney.  On behalf of Ms. Lewis, Mr. Baseluos obtained reports from a series of experts, beginning with Dr. Djalilian.

Dr. Djalilian generally opined that influenza ("flu") vaccinations that Ms. Lewis received on August 20, 2012, and January 14, 2015, caused her significant hearing loss.  Exhibit 15 at 10.  Dr. Djalilian theorized that the flu vaccination prompts the production of cytokines and cytokines, in turn, lead to migraines.  Id. at 6-7.  Dr. Djalilian's next step was to opine that migraines can cause hearing problems, including a hearing problem from which Ms. Lewis suffered, endolymphatic hydrops.  Id. at 7.

In response to Dr. Djalilian, the Secretary obtained a report from an otolaryngologist, Douglas Bigelow, who disagreed with Dr. Djalilian's conclusion.  While Dr. Bigelow agreed that Ms. Lewis suffered from migraines, Dr. Bigelow indicated that the migraines started before the flu vaccinations.  Exhibit A at 12.  Dr. Bigelow also saw Ms. Lewis's symptoms as consistent with migraines, not with endolymphatic hydrops, the diagnosis in Dr. Djalilian's report.  Id. at 15.  Dr. Bigelow also questioned the proposed link between flu vaccines and migraines.  Id. at 15-17.

For Ms. Lewis, Mr. Baseluos expanded the field of experts.  To assist with the immunological aspects of how flu vaccine can cause migraines, Mr. Baseluos retained Omid Akbari, who has a Ph.D. in immunology, but not a medical degree.  Professor (or Doctor) Akbari attempted to shore up the cytokine-based theory.  Exhibit 21 at 8-11.  Dr. Akbari also brought forward a theory based upon molecular mimicry.  Id. at 11-12.

To strengthen and clarify the neurologic aspects of his theory, Mr. Baseluos presented a report from Dr. Charleston, a neurologist with expertise in headaches and migraines. Dr. Charleston was not sure Ms. Lewis suffered from migraines. Exhibit 22 at 15. Regardless, Dr. Charleston endorsed the causation theories offered by Dr. Djalilian and Dr. Akbari. Id. at 16.

In addition, Dr. Djalilian responded to Dr. Bigelow's critique of his initial opinions. Dr. Djalilian maintained his positions. Exhibit 18.

After Ms. Lewis had expanded the field of experts, the Secretary, unsurprisingly, did as well. To respond to immunological topics, including the report from Dr. Akbari, the Secretary filed a report from Arnold Levinson, an immunologist. Dr. Levinson disagreed with Dr. Akbari's opinion that molecular mimicry could explain a connection between the flu vaccination and Ms. Lewis's condition because, in part, Ms. Lewis did not suffer from an autoimmune condition. Exhibit J at 7-9. Dr. Levinson also disputed Dr. Djalilian's cytokine-based theory. Id. at 10-11. Dr. Levinson indicated that Ms. Lewis was experiencing hearing problems before the earlier flu vaccination. Id. at 14.

Dr. Bigelow also wrote a supplemental report. Dr. Djalilian and he continued their disagreement over how to interpret Ms. Lewis's medical records. Exhibit T at 1-5. Dr. Bigelow also responded to some aspects of Dr. Charleston's report. Id. at 6-7.

Ms. Lewis had the final word from the experts. See exhibits 24 (Dr. Djalilian), 25 (Dr. Charleston), and 26 (Dr. Akbari). With the submission of those reports, the case was ready to move to its next step, the presentation of arguments from the attorneys through briefs.

A May 3, 2019 order attempted to guide the parties about the expected content of their briefs by identifying disputed issues. Ms. Lewis's case contained multiple areas of dispute. Disputed topics included the sequence of events in her life as Dr. Djalilian and Dr. Bigelow drew different conclusions about the findings of treating doctors. Briefing Order, issued May 3, 2019, at 4. The condition affecting Ms. Lewis was not clear because experts did not agree that she suffered from migraines. Moreover, the otolaryngologists differed about endolymphatic hydrops. Id. at 5. Ms. Lewis was directed to clarify her theory of the case, which appeared to be that flu vaccinations caused migraines and migraines caused hearing problems. Id. at 7 n.2. Finally, the parties were expected to discuss the decline, if any, in Ms. Lewis's hearing. Id. at 11.

The parties discussed this briefing order in a status conference on May 30, 2019. In this status conference, the undersigned also inquired whether the parties had explored informal resolution. The parties represented that they would investigate a potential settlement. These efforts were successful as the parties, on September 9, 2019, submitted a stipulation, proposing an award of $38,000.00. A September 10, 2019 decision adopted the parties' stipulation and awarded Ms. Lewis $38,000.00. Lewis v. Sec'y of Health & Human Servs., No. 15-907V, 2019 WL 5405256 (Fed. Cl. Spec. Mstr. Sept. 10, 2019).

B.  Attorneys' Fees and Costs

Ms. Lewis filed the still pending motion for final attorneys' fees and costs on September 11, 2019. She requested reimbursement for attorneys' fees of $61,423.60, attorneys' costs of $198,452.00, and her own costs of $3,590.00. Pet'r's Mot. for Fees, filed Sept. 11, 2019. The total request was $263,465.60. Other than a discussion of the three experts' qualifications, Ms. Lewis presented relatively little to support their proposed rates. See id. at 3-5. The meager evidence of record at the time of Ms. Lewis's motion for fees included a statement from Mr. Baseluos that "it has been my experience that most experts receive in the range of $400-$450 per hour." Pet'r's Status Rep., filed Dec. 19, 2019, exhibit B at 13.

On September 23, 2019, respondent filed a response to petitioner's motion. Respondent argues that "[n]either the Vaccine Act nor Vaccine Rule 13 requires respondent to file a response to a request by a petitioner for an award of attorneys' fees and costs." Resp't's Resp. at 1. Respondent adds, however that he "is satisfied the statutory requirements for an award of attorneys' fees and costs are met in this case." Id. at 2. Additionally, he recommends "that the special master exercise his discretion" when determining a reasonable award for attorneys' fees and costs. Id. at 3. The Secretary's lack of meaningful response to a motion for attorneys' fees and costs distinguishes this case from cases in non-Vaccine contexts. E.g., McCarty v. United States, 142 Fed. Cl. 616, 623 (2019).

The undersigned sought clarifications regarding some aspects of the application. Order, issued Dec. 18, 2019. Although Ms. Lewis was afforded approximately six weeks to respond, she filed a status report the next day.

The January 24, 2020 Fees Decision found that because Ms. Lewis received compensation she was entitled to reasonable attorneys' fees and costs. Lewis v. Sec'y of Health & Human Servs., No. 15-907V, 2020 WL 831998, at *2 (Fed. Cl. Spec. Mstr. Jan. 24, 2020) (hereinafter "Fees Decision") (citing 42 U.S.C.

4

§ 300aa–15(e)).  Thus, the question was what amount of attorneys' fees and costs was reasonable.  For attorneys' fees, the amount requested was largely, but not entirely, reasonable.  The attorneys' non-expert costs were also mostly reasonable.  Ms. Lewis's personally incurred costs were credited in full.

The controversial aspects of the Fees Decisions concerned the findings for the three experts Mr. Baseluos had retained:  Dr. Djalilian, Dr. Akbari, and Dr. Charleston.  The Fees Decision found that the experts' invoices did not allow crediting of all the time claimed.  In addition, Ms. Lewis had not established the reasonableness of the proposed hourly rates.  In the absence of any persuasive evidence from Ms. Lewis and in the absence of any assistance from the Secretary, the undersigned attempted to fashion hourly rates that were reasonable and consistent with his experience.  Thus, the Fees Decision awarded less than the amount requested.  Fees Decision at 7-13, 2020 WL 831998, at *5-8.

Ms. Lewis sought reconsideration and presented additional information.  Fee Exhibits A-K.  This motion was denied primarily because Ms. Lewis always bore the burden of establishing the reasonableness of her request and the recently submitted information was available to her when she submitted her request.  Lewis v. Sec'y of Health & Human Servs., No. 15-907V, 2020 WL 1283461 (Fed. Cl. Spec. Mstr. Feb. 20, 2020) (hereinafter "Order Denying Reconsideration"); see also Scharfenberger v. Sec'y of Health & Human Servs., 124 Fed. Cl. 225, 234 (2015) ("[I]t is clear that petitioner bears the burden of proof and respondent in fact is not required to make any objection for the special master to deny fees and costs[.]") (citation omitted).  In addition, the order was concerned that prolonged disputes about attorneys' fees would consume judicial resources that could be devoted to other cases.  Order Denying Reconsideration at 6, 2020 WL 1283461, at *3.

Ms. Lewis filed a motion for review, arguing that the reductions for Dr. Djalilian, Dr. Akbari, and Dr. Charleston were arbitrary and capricious and/or an abuse of discretion.  For all three experts, Ms. Lewis maintained that they were entitled to higher hourly rates.  And, for all three experts, Ms. Lewis contended that a greater number of hours should have been credited.  Pet'r's Mot. for Rev., filed Feb. 21, 2020.  The Secretary, in turn, responded that the awards were within the special master's discretion.  Resp't's Resp. to Pet'r's Mot. for Rev., filed Mar. 23, 2020.

As noted earlier, the Court denied the motion for review in part and granted it in part.  For Dr. Akbari, the Court found that the Fees Decision "articulated a reasonable basis for reducing the hourly rate and the number of hours."  Lewis v.

Sec'y of Health & Human Servs., No. 15-907V, 2020 WL 4433775, at *4 (Fed. Cl. July 15, 2020) (hereinafter "Opinion and Order"). For the reduction in the number of hours for Dr. Charleston, the Court "affirmed" the reduction. Opinion and Order at 2, 2020 WL 4433775, at *8. For the reduction in the number of hours for Dr. Djalilian, the Court "uph[eld] the Special Master's reduction of hours due to inefficiencies." Id. at 13, 2020 WL 4433775, at *11.

However, the Court's assessment differed for the reasonable hourly rates for both Dr. Djalilian and Dr. Charleston. The reduction in Dr. Charleston's hourly rate "requires amplification." Id. at 8, 2020 WL 4433775, at *6. Further, the issue of Dr. Djalilian's rate "is remanded to the Special Master for re-evaluation consistent with" the Court's comments in the Opinion and Order. Id. at 14, 2020 WL 4433775, at *11. Thus, the Court remanded for additional adjudication.

## II.    Standards for Adjudication

Like attorneys' fees, a request for reimbursement of costs must be reasonable. Perreira v. Sec'y of Health & Human Servs., 27 Fed. Cl. 29, 34 (1992), aff'd, 33 F.3d 1375 (Fed. Cir. 1994). Reasonable expert fees are determined using the lodestar method, in which a reasonable hourly rate is multiplied by a reasonable number of hours. Caves v. Sec'y of Health & Human Servs., 111 Fed. Cl. 774, 779 (2013).

To determine the reasonableness of an expert's proposed rate, special masters may consider the "area of expertise; the education and training required to provide necessary insight; the prevailing rates for other comparably respected available experts; the nature, quality, and complexity of the information provided; [and] the cost of living in the expert's geographic area." Sabella v. Sec'y of Health & Human Servs., 86 Fed. Cl. 201, 206 (2009). Furthermore, the "[p]etitioner has the burden of providing the foregoing information concerning expert fees." Id.

The Fees Decision indicated the experts seeking the highest hourly rates have credentials in two respects: strong qualifications and experience in the Vaccine Program. Fees Decision at 8, 2020 WL 831998, at *5. But, the Court found that the lack of experience in the Vaccine Program could not be a basis for reducing an expert's hourly rate when a finding regarding the reasonable number of hours accounted for the resultant inefficiencies. Opinion and Order at 12-13, 2020 WL 4433775, at *9-10. On the other hand, the Court appeared to endorse the markers of qualifications. Factors contributing to an expert's qualifications include "teaching at prestigious medical schools, conducting research, writing articles in peer-reviewed journals, reviewing manuscripts before publication in a peer-

6

reviewed journal, being selected to serve on committees of national organizations, and receiving honors or awards that recognize accomplishments." Opinion and Order at 10, 2020 WL at 4433775, at *8 (quoting Fees Decision at 8, 2020 WL 831998, at *5).

### III. Analysis

The Court's Order and Opinion dictated re-examination of the hourly rates for Dr. Djalilian and Dr. Charleston. After those findings are made, they are incorporated into findings from other adjudications to derive a result for Ms. Lewis's September 11, 2019 motion.

### Dr. Djalilian

Dr. Djalilian's curriculum vitae, which was filed as exhibit 15, tab CC, presents the following information about him. He graduated medical school in 1996. He is board-certified in otolaryngology and neurotology. When he submitted his first report, he was a professor of clinical otolaryngology at the University of California Irvine Medical Center. He has written nearly one hundred articles published in peer-reviewed journals and acted as the principal investigator for research grants.

The Fees Decision acknowledged that "Dr. Djalilian has good professional experience." Fees Decision at 8, 2020 WL 831998, at *5. However, it appears that the Court appraised Dr. Djalilian's credentials more highly. See Opinion and Order at 10, 2020 WL 4433775, at *9. Upon further review, the undersigned recognizes that the Fees Decision undervalued his credentials in the field of otolaryngology.

Nevertheless, for his work in this case, Dr. Djalilian's work does not warrant an increase in his hourly rate to the proposed rate due to the quality of his work in this case. Strong credentials, by themselves, do not always warrant a high rate of compensation. When a well-credentialed person presents work of a quality not commensurate with his (or her) background, then the special master is not obligated to compensate at a high hourly rate. See Frantz v. Sec'y of Health & Human Servs., 146 Fed. Cl. 137, 145-46 (2019) (denying motion for review and finding reduction for neurologist's work reasonable); A.W. by and through Wood v. Sec'y of Health & Human Servs., No. 15-1568V, 2019 WL 518521, at *8 (Fed. Cl. Spec. Mstr. Jan. 11, 2019) (declining, in an exceptional case, to compensate expert entirely due to poor work).

7

Before explaining some weaknesses in Dr. Djalilian's work, the undersigned pauses to express some reluctance in criticizing Dr. Djalilian. If the parties had briefed the issues in response to the May 3, 2019 order and if the case had proceeded to a hearing during which Dr. Djalilian would have testified, then Ms. Lewis and Dr. Djalilian could have addressed some concerns. The parties' settlement in which both the petitioner and the respondent considered the costs and risks of continued litigation was reasonable when the parties reached their agreement.

The undersigned also recognizes that attorneys for petitioners have argued that doctors may be reluctant to participate in the Vaccine Program because the doctors fear the special masters may disagree with their opinions. To some extent, the undersigned tried to avoid directly commenting on Dr. Djalilian's performance by ascribing some weaknesses to a lack of experience. The undersigned recognizes that this attempt to be diplomatic in refraining from an overt (partially negative) evaluation of Dr. Djalilian's work may have left an ambiguity about the reason for the decrease in the hourly rate for Dr. Djalilian.

Now, after the motion for review and the Court's remand, the undersigned will specifically evaluate "the nature, quality, and complexity of the information provided." Sabella, 86 Fed. Cl. at 206. To review, Dr. Djalilian's basic opinion consisted of two steps: (1) vaccines can cause migraines, and (2) migraines can cause hearing loss. On both points, his opinions were problematic.

With regard to the theory that vaccines can cause migraines, Dr. Djalilian appears not to have any specific training in the obviously relevant discipline, which is immunology. (Dr. Djalilian's experience with migraines is discussed below.) To explain how vaccines can cause headaches or migraines, Dr. Djalilian proposed a cytokine-based theory. Exhibit 15 at 6-7. However, special masters have been unpersuaded by a theory that blames a disease on the production of cytokines that naturally follow a vaccination. See Salerno v. Sec'y of Health & Human Servs., No. 16-1280V, 2020 WL 3444163, at *13 (Fed. Cl. Spec. Mstr. May 29, 2020) (citing cases). In addition, the undersigned has declined to credit a cytokine-based theory to explain how vaccines might cause migraines. McGuire v. Sec'y of Health & Human Servs., No. 10-609V, 2015 WL 6150598 (Fed. Cl. Spec. Mstr. Sept. 18, 2015). Thus, with respect to the first step in Dr. Djalilian's two-part opinion, Dr. Djalilian was not operating in an area in which his knowledge was greatest, and his cytokine-based theory had not been persuasive in previous cases. Thus, while Dr. Djalilian has impressive qualifications in otolaryngology, the main thrust of his opinion did not draw upon these qualifications. Later, Ms. Lewis added Dr. Akbari to present information from a specialist in immunology.

For the second part of Dr. Djalilian's opinion, that migraines can cause hearing loss and that the migraines did cause Ms. Lewis's hearing loss, Dr. Djalilian stands on more solid ground.  He has "published articles on the relationship between migraine and ear disorders."  Exhibit 15 (first report) at 1; accord exhibit 15 tab CC (curriculum vitae) at 15 (Meniere's disease), 18 (migraine associated vertigo), 24 (migraine related vestibulopathy), 33 (Meniere's disease), 33 (migraine related vertigo), and 34 (migraine related vertigo).  Of course, as a doctor with board-certification in otolaryngology with a subspecialty in neurotology, Dr. Djalilian is well-qualified to express opinions about hearing loss.  His credentials on the topic of hearing are obvious.

The problem, however, is that Dr. Djalilian's opinions about Ms. Lewis's hearing problems are not very strong.  Dr. Djalilian stated that "Ms. Lewis began experiencing symptoms within the first week after the first vaccination in January 2012."  Exhibit 15 at 8.  However, Dr. Bigelow, who is also board-certified in otolaryngology with a certification in neurotology, raised several points against this opinion, including Ms. Lewis's experience of dizziness, which may be a manifestation of migraines, before the earlier vaccination.  Exhibit A at 11-12.  In defending his position, Dr. Djalilian questioned the accuracy of records Ms. Lewis's treating doctors created.  See exhibit 24.  The undersigned has rarely, if ever, seen such a critical attack on treating doctors.

The undersigned cannot conclude with certainty that Dr. Djalilian's challenges to the records of treating doctors were misplaced because Dr. Djalilian was not called upon to explain his views at a hearing.  Likewise, at a hearing, Dr. Djalilian could have established the persuasiveness of his views regarding the onset of Ms. Lewis's hearing loss.  But, what might have happened at a hearing is hypothetical.  Maybe at a hearing, Dr. Djalilian's opinions would have weakened.

In the absence of a hearing, the undersigned must assess the quality of Dr. Djalilian's work based upon the evidence as it exists.  As explained above, the quality of Dr. Djalilian's work was not at the top of the scale.

On the other hand, Dr. Djalilian's work was far from valueless.  His opinions, in combination with the opinions of Dr. Akbari and Dr. Charleston as well as the potential cost of continued litigation, appear to have contributed to settling the case.

In sum, a reconsideration of Dr. Djalilian's credentials indicates that when his work is better, his hourly rate should be higher than the rate award in the Fees Decision, which was $375 per hour.  But, any general increase is tempered by the

9

quality of the work performed here.  After taking all factors into account, the undersigned finds that a reasonable hourly rate for Dr. Djalilian's work in this case is $450 per hour, an increase of 20 percent.  A rate of $450 per hour is the top of the range for "most" experts in Mr. Baseluos's experience.  Pet'r's Status Rep., filed Dec. 19, 2019, exhibit B at 13.

### Dr. Charleston

Dr. Charleston graduated from the Wayne State University School of Medicine in 2005.  After an internship and residency, he completed a fellowship in headache and facial pain at the Jefferson Headache Center in Philadelphia, Pennsylvania.  From July 2015 through April 2017, he attended the National Clinical Scholars Program at the University of Michigan.  He became board-certified in psychiatry and neurology in 2009, with a subspecialty in headache medicine in 2012.  He has written at least 16 articles published in peer-reviewed journals.  He has served on various committees of the American Academy of Neurology and the American Headache Society.  Exhibit 20 (curriculum vitae).

Without citing any cases, Ms. Lewis argued that Dr. Charleston's proposed hourly rate of $575.00 per hour "is commensurate with his specialty in neurology and headache medicine."  Pet'r's Mot. at 5.  Also without citing any cases, the undersigned disagreed, finding that a reasonable hourly rate for Dr. Charleston's work in this case is $400.00 per hour.  Fees Decision at 13, 2020 WL 831998, at *8.  The Court remanded for additional discussion of this determination.

As the Court pointed out, special masters have awarded some neurologists more than $400 per hour and the Court provided four examples.  Opinion and Order at 8, 2020 WL 4433755, at *7.  In Gowans v. Sec'y of Health & Human Servs., No. 14-440V, 2017 WL 1842824, at *5 (Fed. Cl. Spec. Mstr. Aug. 12, 2017), the undersigned awarded Nizar Souayah $500 per hour with little, if any, analysis.  Dr. Souayah is relatively well-known in the Vaccine Program.  For a review of his biography, see Salmins v. Sec'y of Health & Human Servs., No. 11-140V, 2014 WL 1569478, at *10 (Fed. Cl. Spec. Mstr. Mar. 31, 2014).  His background includes being a professor of neurology at the New Jersey Medical and Dental School and board-certified in neurology, neuromuscular medicine, psychiatry, and electrodiagnostic medicine.  He has also written articles on vaccine-related adverse reactions.  Id.  In an earlier case toward the beginning of Dr. Souayah's work in the Vaccine Program, he was awarded $425 an hour.  Chevalier v. Sec'y of Health & Human Servs., No. 15-001, 2017 WL 490426, at *3 (Fed. Cl. Spec. Mstr. Jan. 11, 2017).

10

In Rosof v. Sec'y of Health & Human Servs., No. 14-766V, 2017 WL 1649802, at *4 (Fed. Cl. Spec. Mstr. Mar. 31, 2017), a special master reduced Dr. Steinman's proposed hourly rate from $550 to $500.  Dr. Steinman is "a board-certified neurologist who practices and teaches at Stanford University Hospital."  Id.  Dr. Steinman has "'contributed to the Vaccine Program substantially … by researching specific mechanisms of molecular mimicry of various vaccines injuries to various vaccines.'"  Id. at 3 (quoting Pet'r's Mot., exhibit 6 at 5).  The special master in Rosof noted that "in the Vaccine Program, even the payment of $500 per hour is rare."  Id. at 4 (citing cases).  Approximately five years earlier, Dr. Steinman was awarded $450 per hour for his work in previous years.  Brown v. Sec'y of Health & Human Servs., No. 09-426V, 2012 WL 952268, at *10 (Fed. Cl. Spec. Mstr. Feb. 29, 2012).

In Smith v. Sec'y of Health & Human Servs., No. 18-0043V, 2020 WL 1243238, at *9 (Fed. Cl. Spec. Mstr. Feb. 20, 2020), a special master reduced the proposed hourly rate for Dr. Jack Burks from $650 to $500 per hour.  This decision states Dr. Burks has qualifications in "neurology and immunology."  Id. at *8.  He had been a been a clinical professor of neurology at Florida International University and Nova Southeastern University.  Id. at *9 n.14.

However, all neurologists do not always receive $500 per hour.  For example, Shinskey v. Sec'y of Health & Human Servs., No. 15-713V, 2019 WL 2064558, at *5 (Fed. Cl. Spec. Mstr. May 9, 2019), awarded Dr. Morgan $400 per hour.  Dr. Morgan has been an assistant professor in the department of clinical neuroscience at the School of Medicine of Brown University.  Stitt v. Sec'y of Health & Human Servs., No. 09-653V, 2013 WL 3356791, at *5 (Fed. Cl. Spec. Mstr. May 31, 2013).

Carlo Tornatore also typically receives $400 per hour.  E.g., Caruso v. Sec'y of Health & Human Servs., No. 15-200V, 2017 WL 5381004, at *4 (Fed. Cl. Spec. Mstr. Sept. 26, 2017).  Dr. Tornatore is also well-known in the Vaccine Program.  He is a professor of neurology at the Georgetown University Medical Center and the Vice Chairman of the Department of Neurology at MedStar Georgetown University Hospital.  Maciel v. Sec'y of Health & Human Servs., No. 15-362V, 2018 WL 6259230, at *5 (Fed. Cl. Spec. Mstr. Oct. 12, 2018).

None of those decisions constitute binding precedent, requiring any particular finding regarding Dr. Charleston's hourly rate.  Opinion and Order at 7, 2020 WL 4433755, at *5 (citing Boatmon v. Sec'y of Health & Human Servs., 941 F.3d 1351, 1358 (Fed. Cir. 2019)).  Moreover, a uniformity in outcome in attorneys' fees cases is not necessary.  Estate of Borst v. O'Brien, 979 F.2d 511,

11

514 (7th Cir. 1992); see also Trimper v. City of Norfolk, 58 F.3d 68, 74-75 (4th Cir. 1995).

To the extent that these decisions provide coherent guidance, one lesson is that neurologists who have additional background in immunology, such as Dr. Steinman and Dr. Souayah, merit a premium. Their knowledge of immunology allows Dr. Steinman and Dr. Souayah to communicate how a body responds to a vaccine, a process that involves the immune system. Dr. Steinman and Dr. Souayah have also researched how vaccines might cause an adverse reaction. These factors place them at a tier higher than Dr. Charleston, whose report contained very little immunology. Experts who have expertise in multiple disciplines may be compensated at a higher hourly rate. See Ross-Hime Designs, Inc. v. United States, 124 Fed. Cl. 69, 74 (2015) (declining to compensate someone at $500 per hour as a legal expert when the person, who was an engineer, testified about technical aspects of robotics).

Dr. Charleston does not possess extraordinary credentials that justify a very high hourly rate. For example, unlike Dr. Steinman, Dr. Souayah, and Dr. Tornatore, Dr. Charleston is a "Clinical Assistant Professor in Neurology" at the University of Michigan. Exhibit 20 (curriculum vitae) at 1. Those other doctors are full professors with tenure. That difference also suggests that Dr. Charleston should be compensated at a rate lower than the rate they receive.

In stating that Dr. Charleston does not possess "extraordinary credentials," the undersigned does not intend to demean Dr. Charleston, who appears to be a well-credentialed and well-trained neurologist with a specialty in headaches. It is simply that for "ordinary" neurologists that teach at good medical schools, such as Dr. Morgan or Dr. Tornatore, a rate of $400 per hour is reasonable.

In offering an opinion about headaches, Dr. Charleston's work was fine. His reports fall within a wide band of reasonableness and do not warrant an adjustment either up or down from a reasonable hourly rate of $400.

## Calculations

The findings for Dr. Djalilian's reasonable hourly rate ($450 per hour) and Dr. Charleston's reasonable hourly rate ($400) can be entered into the lodestar formula to determine a reasonable amount of compensation. According to the January 24, 2020 Fees Decision and the Court's Opinion and Order, which denied the motion for review on these points, a reasonable number of hours for Dr. Djalilian was 117 hours and for Dr. Charleston was 49.05.

|  | rate | # hours | total |
|---|---|---|---|
| Dr. Djalilian | $450 | 117.00 | $52,650.00 |
| Dr. Charleston | $400 | 49.05 | $19,620.00 |

These determinations can be added to previous findings:

Awarded in Jan. 24, 2020 Fees Decision and Not Challenged
   Attorney's Fees     $58,423.60
   Attorney's Non-Expert Costs     $693.50
   Ms. Lewis's personally incurred costs     $3,590.00

Awarded in Jan. 24, 2020 Fees Decision and Found Reasonable upon Review
   Dr. Akbari     $34,680.00

Awarded in September 11, 2020 Remand Decision
   Dr. Djalilian     $52,650.00
   Dr. Charleston     $19,620.00

Total Attorneys' Fees and Costs     $169,657.10

## IV. Conclusion

The Vaccine Act permits an award of reasonable attorneys' fees and costs. 42 U.S.C. § 300aa-15(e). A reasonable amount of attorneys' fees and costs is $169,657.10 distributed as follows:

   **a. A total of $166,067.10 (representing $58,423.60 in attorneys' fees and $107,643.50 in attorneys' costs) is awarded as a lump sum in the form of a check jointly payable to petitioner and petitioner's counsel, Mr. Michael Baseluos; and**

   **b. A total of $3,590.00 is awarded in the form of a check payable to petitioner for Ms. Lewis's costs.**

Pursuant to Vaccine Rule 28.1(1), the Clerk's Office is directed to provide this decision to the assigned judge. In the absence of a motion for review filed

pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[2]

**IT IS SO ORDERED**.

s/Christian J. Moran<br>Christian J. Moran<br>Special Master

---

[2] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.